**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-3352 & 09-3563
_____

PITTSBURGH LEAGUE OF YOUNG VOTERS
EDUCATION FUND;
AMERICAN CIVIL LIBERTIES FOUNDATION OF
PENNSYLVANIA,

Appellants in Case No. 09-3563

v.

PORT AUTHORITY OF ALLEGHENY COUNTY;
ANTHONY J. HICKTON,

Appellants in Case No. 09-3352
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 2-06-cv-1064
District Judge: The Honorable Terrence F. McVerry

Argued May 10, 2011

1

Before: SMITH, CHAGARES, and VANASKIE,
*Circuit Judges*

(Filed: August 5, 2011)

Gregory J. Krock (Argued)
Corrado Salvatore
Buchanan Ingersoll & Rooney PC
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA  15219

*Counsel for Appellants*

Jon Pushinsky (Argued)
Law & Finance Building
Suite 1808
429 Fourth Avenue
Pittsburgh, PA 15219

Sara J. Rose
Witold J. Walczak
American Civil Liberties Union
313 Atwood Street
Pittsburgh, PA  15213

*Counsel for Appellees*

_____

OPINION

_____

SMITH, *Circuit Judge.*

Unlike many of its sister states, Pennsylvania allows felons to vote immediately upon release from prison. In an effort to correct widespread belief to the contrary, a coalition of public-interest organizations set out to run an advertisement informing ex-prisoners that they have the right to vote and encouraging them to exercise it. The coalition asked the Port Authority of Allegheny County, Pennsylvania to place the ad in its buses. The Port Authority denied the request, pointing to its written advertising policy, which prohibits "noncommercial" ads. The coalition sued, alleging a violation of the First Amendment. The case proceeded to a bench trial, where the coalition proved that despite its written advertising policy, the Port Authority had accepted many noncommercial ads in recent years, several of which bore a striking resemblance to the coalition's ad. Based mainly on this "comparator" evidence, the District Court found that the rejection of the coalition's ad amounted to viewpoint discrimination in violation of the First Amendment. We will affirm.

3

I. BACKGROUND

Many of Pennsylvania's ex-prisoners do not know they have the right to vote. Seeing a need for public education, a coalition of public-interest groups, including the ACLU and the Pittsburgh League of Young Voters Education Fund, teamed up to start the "Ex-Offender Voting Rights Project." The aims of the Project were to inform ex-prisoners that they have the right to vote, register them to vote, encourage them to vote, and—in the event ex-prisoners were denied the franchise—litigate on their behalf.

The coalition determined that running ads in public buses would be an effective way to reach its target audience, so Lisa Krebbs, an employee of the ACLU, contacted the Port Authority on the coalition's behalf. Krebbs was referred to Anthony Hickton, the Port Authority's Director of Sales. She identified herself as an ACLU employee, described the Ex-Offender Voting Rights Project, and informed Hickton that the coalition was interested in placing an ad in city buses. Although no draft had yet been prepared, she explained that the ad would inform ex-prisoners that they have the right to vote, encourage them to vote, and provide a phone number that they could call if they needed help or had questions. Hickton told Krebbs that the Port Authority would not run the ad. He explained that the ad as described did not comply with the Port Authority's written advertising policy, which prohibited "noncommercial" advertisements.

The coalition tried several times to persuade the Port Authority to reverse course. It corresponded with Hickton

4

and the Port Authority's in-house counsel Chris Hess, explaining that its advertisement was no different from many other noncommercial ads commonly displayed in Port Authority buses. Hickton and Hess refused to budge. The coalition therefore filed this lawsuit under 42 U.S.C. § 1983, alleging a violation of the First Amendment's Free Speech Clause. The complaint asserted, first, that the Port Authority's advertising space is a public forum and that rejecting the coalition's ad thus amounted to impermissible content-based discrimination. Second, the complaint asserted that the Port Authority had rejected the coalition's ad as a result of unconstitutional viewpoint discrimination.

While the lawsuit was pending, the parties and their attorneys met to discuss a possible settlement. During the meeting, Hess asserted—for the first time—that the Port Authority had rejected the coalition's ad not just because it was "noncommercial" but also because it was "political," another subject matter banned under the advertising policy. Ultimately no settlement was reached, and the litigation proceeded apace.

After the close of discovery, the parties filed cross motions for summary judgment. The District Court denied the coalition's motion. The Court granted the Port Authority's motion on the content-based-discrimination claim, holding that the advertising space is not a public forum. But the Court denied its motion as to the viewpoint-discrimination claim, concluding that a genuine dispute existed about whether the Port Authority had rejected the coalition's ad because of hostility towards the ad's message.

5

What remained of the § 1983 suit—the viewpoint-discrimination claim—was scheduled for a bench trial.

The trial lasted five days, and the Court heard testimony from a number of witnesses, including Hickton and Hess, the decisionmakers responsible for rejecting the coalition's ad. In support of the Port Authority's position, Hess testified that he had once rejected an "ad from the League of Women Voters that just sort of said 'vote.'" JA 1428. Hess and Hickton, moreover, offered definitions of the terms "political" and "commercial," which are not defined in the advertising policy. Their definitions differed somewhat, but they agreed that an ad is not commercial unless it in some way promotes the monetary interests of the advertiser.

The Court also received evidence about other ads that the Port Authority has run in its buses. As it turns out, the Port Authority has not consistently adhered to the advertising policy's ban on noncommercial ads. It has run a number of noncommercial ads in recent years, including ads placed by organizations known as Just Harvest, the Fair Housing Partnership, and the Women's Law Project.

Just Harvest is a nonprofit organization dedicated to the elimination of poverty and hunger. Its advertisement (which Hickton acknowledged was not commercial in nature) informed low earners about their entitlement to the earned income tax credit, a refundable tax credit given to low-income workers and their families. The ad also stated that Just Harvest would prepare simple tax returns for low-income workers free of charge.

6

The Fair Housing Partnership is a nonprofit group committed to fighting housing discrimination. Its ad informed the public that housing discrimination is illegal and provided a phone number that people could call if they had questions or needed help. The Partnership does not charge for its services, and Hickton knew this when he accepted the ad.

The Women's Law Project is a nonprofit organization dedicated to advancing the rights and status of women. When originally submitted, the Project's ad said, "Just because you're young doesn't mean you don't have rights. Call the Women's Law Project for free legal information." Refusing to accept the ad as submitted, Hess recommended that "free legal information" be changed to "confidential legal services." Although "free legal information" was more accurate (when a woman called she would typically receive free information, not legal services), the Project acquiesced in Hess' recommendation and the ad was run.

After the trial, the District Court issued an opinion concluding that the Port Authority had rejected the coalition's ad as a result of viewpoint discrimination. The Court found, first, that the Port Authority did not really reject the ad because of its supposed political character. Because the Port Authority did not mention this basis until after the litigation had begun, the Court found that it was merely a post hoc rationalization for the rejection. The Court concluded, moreover, that the Port Authority's claim that it had rejected the ad because it was noncommercial was a pretext for viewpoint discrimination. The Court found that the ads

7

placed by Just Harvest, the Fair Housing Partnership, and the Women's Law Project were—like the coalition's proposed ad—noncommercial ads designed to educate readers about their legal rights. That the Port Authority had accepted these ads, but rejected the coalition's ad for the stated reason that it was noncommercial, raised an inference of viewpoint discrimination that the Port Authority had failed to rebut.

The Port Authority appealed.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have final-order jurisdiction under 28 U.S.C. § 1291. We review a district court's legal conclusions *de novo*, and ordinarily review its factual findings for clear error. Fed. R. Civ. P. 52(a); *McCutcheon v. America's Servicing Co.*, 560 F.3d 143, 147 (3d Cir. 2009). In *Bose Corp. v. Consumers Union*, 466 U.S. 485 (1984), however, the Supreme Court instructed that "in cases raising First Amendment issues[,] an appellate court has an obligation to 'make an independent examination of the whole record.'" *Id.* at 499 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964)). Independent fact review is necessary, *Bose* explained, "to make sure that 'the [trial court's] judgment does not constitute a forbidden intrusion on the field of free expression,'" *id.* (quoting *Sullivan*, 376 U.S. at 285), and to provide appellate courts with greater control over the case-by-case elaboration of First Amendment principles, *id.* at 501–03.

8

*Bose*'s law-refinement purpose is triggered in all First Amendment cases, but its speaker-protection purpose is triggered only in cases where the speaker lost at the trial level. *See* Eugene Volokh & Brett McDonnell, *Freedom of Speech and Independent Judgment Review in Copyright Cases*, 107 Yale L.J. 2431, 2442–43 (1998). It is therefore unclear whether *Bose* applies to First Amendment cases generally, or whether it is limited to First Amendment cases in which the speaker unsuccessfully claimed a violation of free speech rights in the trial court. There are circuit decisions on both sides of the question. *Compare Planned Parenthood Ass'n v. Chicago Transit Auth.*, 767 F.2d 1225, 1229 (7th Cir. 1985) (*Bose* applies only when the speaker lost at the trial level), *with Bartimo v. Horsemen's Benevolent & Protective Ass'n*, 771 F.2d 894, 897 (5th Cir. 1985) (*Bose* applies to First Amendment cases generally). This is a substantial legal issue, but we decline to weigh in on it. We need not take sides on the question of *Bose*'s application here because we would uphold the District Court's finding of viewpoint discrimination under either the *Bose* or clear-error standard.

## III. MERITS

The government does not have "to grant access to all who wish to exercise their right to free speech on every type of [public] property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985). The Supreme Court has developed a forum analysis to determine

9

when the government's interest in limiting the use of its property outweighs the interest of those wishing to use the property as a place for expressive activity. *Id.*

There are three types of fora. *Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2984 n.11 (2010). On one end of the spectrum lie traditional public fora. These fora, of which public streets and parks are examples, "'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)). In traditional public fora, content-based restrictions on speech are subject to strict scrutiny (*i.e.*, the restrictions must be narrowly tailored to serve a compelling governmental interest). *Id.* Next are designated public fora. These fora consist of public property "that has not traditionally been regarded as a public forum" but that the government has intentionally opened up for use by the public as a place for expressive activity. *Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1132 (2009). As is the case in traditional public fora, content-based restrictions are subject to strict scrutiny in designated public fora. *Perry*, 460 U.S. at 45. Finally, public property that "is not by tradition or designation a forum for public communication" constitutes a nonpublic forum. *Id.* at 46. Access to a nonpublic forum can be restricted so long as the restrictions are reasonable and viewpoint neutral. *Cornelius*, 473 U.S. at 800.

10

The parties agree that the advertising space in Port Authority buses is not a traditional public forum. They disagree, though, over whether the space constitutes a designated public forum or a nonpublic forum. The coalition argues that the space is a designated public forum because the Port Authority's practice has been to accept virtually all ads from all advertisers. The Port Authority disagrees, asserting that the space is a nonpublic forum because it has consistently refused to accept, for example, political ads. *See* Port Auth. Br. at 55 (citing *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974)). Although the parties have briefed and argued the issue, we need not tackle the forum-selection question. Regardless of whether the advertising space is a public or nonpublic forum, the coalition is entitled to relief because it has established viewpoint discrimination.

Viewpoint discrimination occurs when the government "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). *See also Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004) (explaining that the government engages in viewpoint discrimination when it suppresses speech because it disagrees with "the underlying ideology or perspective that the speech expresses"). Viewpoint discrimination is anathema to free expression and is impermissible in both public and nonpublic fora. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *Perry*, 460 U.S. at 46. So if the government allows speech on a certain subject, it must accept all viewpoints on the subject, *Cornelius*, 473 U.S. at 806, even those that it disfavors or that are unpopular, *Rosenberger*, 515 U.S. at 829. *See also*

11

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392–93 (1993) (where government allowed nonpublic forum to be used for discussion of certain subjects, it could not deny access to those wishing to discuss the subjects from a religious standpoint).

The Port Authority claims to have rejected the coalition's ad on the grounds that it was "political" and "noncommercial"—two types of ads that are banned under the advertising policy. The "political" ground can quickly be dismissed. Because the Port Authority did not mention this basis until after the lawsuit had been filed, the District Court permissibly found that it was not a real basis for rejecting the ad but was, instead, a post hoc rationalization. And in any event it is less than obvious that the ad could even be considered "political" in nature. It would not have called on citizens to, say, vote for a specific candidate or publicly support a certain cause. *Cf. Lehman*, 418 U.S. at 317 (Brennan, J., dissenting) (suggesting that a "public service ad by the League of Women Voters . . . advertising the existence of an upcoming election and imploring citizens to vote" would not qualify as a "political" ad in the ordinary sense of the word).

The Port Authority's explanation that it rejected the coalition's ad because of its noncommercial character requires more analysis. This is a viewpoint-neutral explanation for the rejection, *see id.* at 304 (majority opinion); *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 979–80 (9th Cir. 1998), and the Port Authority has consistently relied on it since Hickton's initial rejection of the

12

ad. As in the employment-discrimination context, however, the recitation of a nondiscriminatory rationale is not sufficient standing alone because it could be a cover-up for unlawful discrimination. *Cornelius*, 473 U.S. at 812. As the First Circuit explained in a case similar to this one:

> There are various situations which will lead a court to conclude that, despite the seemingly neutral justifications offered by the government, nonetheless the decision to exclude speech is a form of impermissible discrimination. . . . First, statements by government officials on the reasons for an action can indicate an improper motive. Second, where the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted, this sort of underinclusiveness raises a suspicion that the stated neutral ground for action is meant to shield an impermissible motive. Third, suspicion arises where the viewpoint-neutral ground is not actually served very well by the specific governmental action at issue; where, in other words, the fit between means and ends is loose or nonexistent.

*Ridley*, 390 F.3d at 87 (citations and footnote omitted); *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The coalition is not armed with direct evidence of discrimination. This is hardly surprising. "[T]he government

13

rarely flatly admits it is engaging in viewpoint discrimination." *Ridley*, 390 F.3d at 86. Nor is there a lack of fit between the Port Authority's viewpoint-neutral explanation (*i.e.*, that it only accepts commercial ads) and its rejection of the coalition's ad. It is beyond dispute that the coalition's ad was not commercial in nature. To establish viewpoint discrimination, then, the coalition has advanced a comparator analysis. It argues that although the Port Authority says it rejected the ad for being noncommercial, it accepted several other noncommercial advertisements, thereby raising a suspicion of viewpoint discrimination.

The coalition focuses on the ads placed by Just Harvest, the Fair Housing Partnership, and the Women's Law Project. The District Court determined that these ads were similar to the coalition's proposed advertisement. Most importantly the Court found that the ads, like the coalition's, were noncommercial in nature. The Port Authority challenges this finding, arguing that the comparator ads were in fact commercial because they promoted the provision of services. This is wrong. At most the comparator ads promoted the provision of *free* services, and the record is filled with evidence, including testimony from Hickton and Hess, that the Port Authority did not consider ads promoting free services to be commercial. This makes sense: providing free services is ordinarily thought to be a form of charity, not commercial activity. That the Port Authority accepted several noncommercial ads, but rejected the coalition's ad for the stated reason that it was noncommercial, was evidence that the District Court could properly consider as strongly suggesting viewpoint discrimination. *See Cornelius*, 473 U.S.

14

at 812; *Ridley*, 390 F.3d at 87; *Cuffley v. Mickes*, 208 F.3d 702, 709–11 (8th Cir. 2000); *AIDS Action Comm. of Mass., Inc. v. Mass. Bay Transp. Auth.*, 42 F.3d 1, 9–12 (1st Cir. 1994).

The suspicion of viewpoint discrimination is fortified by the high degree of similarity between the coalition's ad and the comparator ads. As the District Court observed, the coalition's ad and the comparator ads were all designed to educate readers about their legal rights. The coalition's ad would have informed ex-prisoners that they have the right to vote and provided a number they could call with questions. Similarly, the Just Harvest ad educated low earners about their right to the earned income tax credit and about Just Harvest's free tax preparation services. The Fair Housing Partnership's ad informed readers that they have a right to be free from housing discrimination and provided a number they could call if they had questions. The Women's Law Project's ad was designed to advise young women about a resource for obtaining free information regarding their legal rights. The similarity between the comparator ads and the coalition's ad is unmistakable, and thus provides firm ground for the District Court's finding of viewpoint discrimination.

The Port Authority says the District Court's finding of viewpoint discrimination was erroneous for two reasons. First, it points to Hess' testimony that he once rejected an ad from the League of Women Voters that simply encouraged people to vote. Stressing the similarity between the League's ad and the coalition's, the Port Authority argues that this testimony proves that it rejected the coalition's ad not because

15

of hostility towards the ad's message but because the ad (like the League's) was noncommercial. We agree that this testimony cut against a finding of viewpoint discrimination. But the District Court weighed it against the coalition's comparator evidence and found that the comparator evidence more compellingly favored a finding of viewpoint discrimination. We see no error here.

As between evidence that a decisionmaker acted at odds with a nondiscriminatory rationale and evidence that the decisionmaker acted consistently with the rationale, the former is often stronger proof of discrimination than the latter is of nondiscrimination. *See McDonnell Douglas*, 411 U.S. at 804. Suppose, for example, that a company fired a black employee for the stated reason that she had missed work on three occasions. Suppose further that the company had refused to fire three white employees who had missed work three times but that it had terminated one white employee who had thrice missed work. The fact finder in this hypothetical case could permissibly infer that the company's race-neutral rationale was a pretext for discrimination even though the company had fired a white employee who had missed work on three occasions. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–48 (2000); *McDonnell Douglas*, 411 U.S. at 804; *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352–54 & n.5 (3d Cir. 1999). From this it follows that the rejection of the League of Women Voters' ad did not compel the District Court to rule in the Port Authority's favor.

16

Second, the Port Authority contends that the finding of viewpoint discrimination was improper because the evidence shows that it simply made a mistake in accepting the comparator ads. That is not so. The evidence shows that the Port Authority accepted the comparator ads with full knowledge of their contents, which is to say the ads did not just "slip through the cracks." This suggests that, despite the written ban on noncommercial ads, the Port Authority decided that it would accept noncommercial, rights-education advertisements similar to the comparator ads. *See Cuffley*, 208 F.3d at 711 (noting, in a viewpoint-discrimination case, that the government's "actions speak louder than its words"). That the Port Authority made this decision and yet rejected the coalition's advertisement, which was materially indistinguishable from the comparator ads, amply establishes viewpoint discrimination.

A final word about the implications of our decision: in upholding the District Court's ruling, we do not suggest that the Port Authority must accept all noncommercial, rights-education advertisements going forward. We hold only that the facts of *this* case indicate viewpoint discrimination, and that the coalition is therefore entitled to relief. If the Port Authority were to develop more precisely phrased written guidance on the ads for which it will sell advertising space and apply the guidance in a neutral and consistent manner, it may, in the future, be able to reject ads like the one at issue in this appeal. *See AIDS Action Comm.*, 42 F.3d at 12–13.

IV. CONCLUSION

17

The District Judge afforded the parties a fair trial. He patiently listened to five days of testimony, considered an extensive set of exhibits, and issued a thoughtful, detailed opinion concluding that the Port Authority's rejection of the coalition's ad was motivated by hostility towards the ad's message. We see no clear error in the underlying findings, and the record fully supports the Judge's ruling. We will affirm.