HARDIMAN, Circuit Judge,
dissenting.
“[T]he government, ‘no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.’ ” Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (quoting Greer v. Spock, 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976)). In this appeal, the Court deprives the City of Philadelphia of this power by finding its ban on noncommercial advertising in parts of its airport facially invalid because the prohibition lacks record and common sense support. Because I view the City’s restriction a reasonable attempt to avoid controversy at the airport, I respectfully dissent.[1]
*450 I
A
In 2011, the NAACP released a report entitled Misplaced Priorities which described the disparity between government spending on prisons and education in cities such as Philadelphia, New York, and Los Angeles.[2] In anticipation of the report’s release, the NAACP planned a broad advertising campaign, which included a series of advertisements at the Philadelphia International Airport (the Airport).
The Airport is 3,254,354 square feet and includes seven terminals and 126 boarding gates. Like all large airports, it contains numerous retail businesses and various kiosks filled with advertisements targeting travelers. The City of Philadelphia, which owns and operates the Airport, maintains over 100 wall-mounted flat screen monitors to display advertisements.
The NAACP sought permission to run an advertisement for Misplaced Priorities on two of the Airport’s monitors. The advertisement featured a silhouette of the Statue of Liberty next to a block of text that read: “Welcome to America, home to 5% of the world’s people & 25% of the world’s prisoners.” NAACP Br. 10. Beneath this text, the advertisement contained an additional sentence reading: “Let’s build a better America together. NAACP.org/smartandsafe.” Id. The City refused to display the NAACP’s advertisement. And it did so even though the City had no written policy governing the rejection of advertisements and despite the fact that it had previously accepted issue-oriented advertisements.
In October 2011, the NAACP filed suit in the United States District Court, for the Eastern District of Pennsylvania alleging that the City’s rejection of its advertisement violated the First Amendment. Almost six months later, the City issued a written policy (the Policy) regulating advertising at the Airport. Most relevant here, the Policy prohibited private parties from displaying advertisements “that do not propose a commercial transaction,” but permitted the City to post messages promoting “the greater Philadelphia area” as well as “[ojther City initiatives or purposes.” NAACP v. City of Philadelphia, 39 F.Supp.3d 611, 623 (E.D. Pa. 2014) (alteration in original). Since the Policy’s enactment, no private noncommercial advertisements have been displayed. Noncommercial messages created by the City have been posted, however.
Three months later, the City and the NAACP entered into an agreement permitting the Misplaced Priorities advertisement to run in the Airport. The parties also agreed that the NAACP would file an amended complaint to challenge the Policy. The NAACP’s amended complaint alleged that the Policy was facially unconstitutional.
B
In the course of discovery in the District Court, the City’s principal witness was James Tyrrell, the Airport’s Deputy Director of Aviation, Property Management, and Business Development. As the City’s Rule 30(b)(6) designee, Tyrrell testified on a number of topics, including “[t]he reason or purpose and the factors considered by the City for its decision to adopt, create, enact or promulgate the Airport Advertising Policy, and any communications concerning that decision.” App. 775.
When asked why the NAACP’s advertisement was rejected, Tyrrell responded *451 that it did not comport with the Airport’s mission “to create an attractive environment to ... promote tourism. It’s to create a family oriented environment. It is to promote the region, to attract customers to the region.” App. 784; see NAACP, 39 F.Supp.3d at 622-23. He went on to say, when questioned whether the NAACP’s advertisement was offensive, that the Airport “make[s] a very concentrated and huge effort to keep everything positive, everything non-controversial, and just create an environment that is soothing and pleasing.” NAACP, 39 F.Supp.3d at 623-24; App. 802. And when asked how a ban on noncommercial advertisements could promote this mission, Tyrrell responded,
If you talk about a commercial ad where someone is selling a product or a service, that is pretty broadly known, accepted, generally not going to be offensive. If you’re talking about a noncommercial ad that is maybe supporting a position of one group or another, that could tend to offend someone who is not in agreement with that position.
App. 808. Tyrrell admitted that he “could not recall” if he had ever discussed this justification in any meeting and that it was “just something he was thinking of’ during his deposition. Id.
After discovery was completed, the City and NAACP filed cross-motions for summary judgment. To adjudicate the motions, the District Court determined that the relevant forum was the City-owned advertising space, not the Airport writ large or the many commercial business that lease space in the Airport. And it concluded that the advertising space was either a limited public forum or a nonpublic forum, but that it need not decide which because both types of forums operate under the same level of judicial scrutiny, i.e., speech restrictions must be reasonable in light of the purposes of the forum and viewpoint neutral.
Starting with viewpoint neutrality, the Court held that neither party was entitled to summary judgment because material facts relative to the City’s motive in enacting the Policy were disputed. It nevertheless concluded that the NAACP was entitled to summary judgment because the Policy was unreasonable.
The District Court’s analysis began by identifying the purposes of the forum, one of which was “maintaining the Airport as a family friendly environment that casts a positive light on [Philadelphia] and the region.” NAACP, 39 F.Supp.3d at 628. In light of this purpose, the Court found the Policy’s exclusion of noncommercial advertisements unreasonable because there was nothing to suggest that noncommercial advertisements are any more (or less) controversial than commercial advertisements. Id. at 629-30. The Court also determined that noncommercial advertisements were in no way incompatible with the Airport as a whole — given that the Airport “con-tainted] many adult-oriented potentially controversial media” in other spaces, restricting noncommercial advertisements in the advertising space would have no' effect on the Airport’s functioning. Id. Accordingly, the Court held the Policy unconstitutional on its face and entered summary judgment in favor of the NAACP.
II
The crux of the City’s appeal is that the Policy is reasonable because it helps to create a comfortable environment at the Airport by avoiding controversy without discriminating against any viewpoint.
A
It is important to note at the outset that the NAACP has brought a facial challenge to the City’s policy. “A facial attack tests a law’s constitutionality based on its text alone and does not consider the facts or *452 circumstances of a particular case.” United States v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010) (citing City of Lakewood v. Plain Dealer Publ’g Co., 486 U.S. 750, 770 n.11, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)). “This is the most difficult challenge to mount successfully,” and it “affects the burden on [the plaintiff].” United States v. Mitchell, 652 F.3d 387, 405 (3d Cir. 2011) (en banc) (internal quotation marks omitted) (citation omitted). “A plaintiff can only succeed in a facial challenge by ‘establishing] that no set of circumstances exists under which the Act would be valid,’ i.e., that the law is unconstitutional in all of its applications.” Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (alteration in original) (quoting United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)).[3]
B
The Constitution does not require the “Government freely to grant access to all who wish to exercise their right to free speech on every type of Government' property without regard to the nature of the property or to the disruption that might be caused by the speaker’s activities.” Cornelius, 473 U.S. at 799-800, 105 S.Ct. 3439. “[N]o less than a private owner of property, [the government] has power to preserve the property under its control for the use to which it is lawfully dedicated.” Id. at 800, 105 S.Ct. 3439 (quoting Greer, 424 U.S. at 836, 96 S.Ct. 1211). To balance “the Government’s interest in limiting the use of its property to its intended purpose” and “the interest of those wishing to use the property for other purposes,” courts engage in forum analysis. Id.
Here, neither party challenges the District Court’s determinations that: (1) forum analysis applies; (2) the relevant forum is the Airport’s monitors; and (3) the forum is either a limited public forum or a nonpublic forum, both of which implicate the same level of scrutiny.[4] Accordingly, the City may restrict the content of speech so long as the restriction is “reasonable in light of the purpose served by the forum” ánd viewpoint neutral. Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (quoting Cornelius, 473 U.S. at 804-06, 105 S.Ct. 3439).[5]
1
To determine whether the Policy is “reasonable in light of the purpose served by the forum,” we look to the “purpose of the *453 forum and all the surrounding circumstances.” Cornelius, 473 U.S. at 806, 809, 105 S.Ct. 3439. In evaluating the Policy’s reasonableness, “we do not ‘require that ... proof be present to justify the denial of access to a nonpublic forum on grounds that the proposed use may disrupt the property’s intended function,’ [but] we have required some explanation as to why certain speech is inconsistent with the intended use of the forum.” Int’l Soc. for Krishna Consciousness v. Lee (ISKCON), 505 U.S. 672, 691-92, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (O’Connor, J., concurring) (alteration in original) (quoting Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 52 n.12, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). In fact, “commonsense ... is sufficient ... to uphold a regulation.” United States v. Kokinda, 497 U.S. 720, 734-35, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion). And the restriction “need only be reasonable; it need not be the most reasonable or the only reasonable limitation.” Cornelius, 473 U.S. at 808, 105 S.Ct. 3439. Stated differently, a regulation of a nonpublic forum “is valid ... unless it is unreasonable, or, as was said in Lehman, ‘arbitrary, capricious, or invidious.’ ” Kokinda, 497 U.S. at 725-26, 110 S.Ct. 3115 (quoting Lehman v. City of Shaker Heights, 418 U.S. 298, 303, 94 5.Ct. 2714, 41 L.Ed.2d 770 (1974)).
Here, as the District Court found, one of the purposes of the advertising space is to “maintain[ ] the Airport as a family-friendly” or comfortable environment. See NAACP, 39 F.Supp.3d at 628; see also App. 802 (Tyrrell stating that the Airport “make[s] a very concentrated and huge effort to keep everything positive, everything non-controversial, and just create an environment that is soothing and pleasing” when asked about the rejection of advertisements).[6]
Our initial task then, is to determine .whether the Policy’s ban on noncommercial advertisements is a reasonable or commonsense way to promote a congenial atmosphere through the use of the City’s more than 100 Airport monitors. I believe it is.
As Tyrrell explained, noncommercial advertisements are more likely to be controversial or offensive than commercial offers. See App. 808. Noncommercial messages often seek to convey an opinion or advocate a position — goals motived by a desire to confront people on issues about which they disagree, sometimes very emotionally. Commercial advertisements on the other hand, seek only to sell a product and are léss likely to advocate a position. Although it is undoubtedly-true that some commercial advertisements may be more controversial or offensive than some noncommer- *454 eial content, common sense suggests that advocative messages are more likely to create rancor and interfere with the City’s desire to promote a congenial atmosphere at the Airport.[7]
To use a simple example, imagine that the monitors are rented by an organization seeking to abolish the death penalty. To advance its cause, the organization depicts videos or photos of executions. If those advertisements were effective, perhaps death penalty advocates or victims’ rights groups would buy space showing similarly gruesome footage of the victims of those who were executed. It would seem obvious that these images would be controversial and inappropriate for travelers heading to their gates. While these examples were (before today) hypothetical, this may no longer be the case. And many courts that have considered similar dilemmas have found prohibitions on public transit like the one here reasonable attempts to keep the peace. See, e.g., Lehman, 418 U.S. at 304, 94 S.Ct. 2714 (plurality opinion) (upholding a ban on noncommercial speech, in part, to avoid subjecting bus passengers and others to controversial messages);[8] Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg’l Transp. (SMART), 698 F.3d 885, 892-94 (6th Cir. 2012) (upholding a ban on political advertisements on buses that “might alienate riders”); Children of the Rosary v. City of Phoenix, 154 F.3d 972, 975, 979 (9th Cir. 1998) (finding it constitutional to limit exterior advertising on buses to “speech which proposes a commercial transaction” and holding that the city’s interests in “maintaining neutrality on political and religious issues” is “especially strong”).
But this does not end our inquiry. For a regulation to pass constitutional muster, it must also be reasonable in light of all the circumstances surrounding the forum. Here, those include the many other media and advertisements that fill the Airport, ranging from television screens tuned to news broadcasts to advertisements within retail outlets. Does the existence of media unconstrained by the Policy render it unreasonable in its regulation of the advertising space? I think not.
By banning noncommercial advertisements on the monitors there will be less controversy in the Airport than there would be if the Policy were never enacted. While other forums scattered throughout the Airport might display controversial noncommercial messages, it still seems reasonable to think that disallowing controversial advertisements on the Airport’s more than 100 monitors will have a positive impact on travelers’ experiences by removing some stress or controversy from their journeys. Because the Policy reasonably achieves the goal of promoting a congenial environment in light of the surrounding circumstances, I would find it facially reasonable.
The NAACP counters that the Policy is unreasonable because it simultaneously forbids the noncommercial speech of private parties and permits noncommercial speech by the City. This argument could carry the day but for the government speech doctrine. Although the First Amendment prevents the City from circumscribing private speech however it wishes, those restrictions do not apply when the City itself speaks and the City *455 may control the content it wishes to display on its monitors. Cf. Walker v. Texas Div., Sons of Confederate Veterans, Inc., - U.S. -, 135 S.Ct. 2239, 2245, 192 L.Ed.2d 274 (2015) (“[W]hen [the] government speaks, it is not barred by the Free Speech Clause from determining the content of what it says.”). Because the City has the latitude to control its own speech, it is reasonable for the City not to subject itself to the same constraints to which it must subject private speakers.
In all, the Policy need not be the most reasonable or the only reasonable way to achieve the goals the City wishes to pursue on its monitors. The Policy need only be reasonable — that is, it must not be arbitrary, capricious, or invidious. For the reasons stated, I would hold that the Policy satisfies what the Majority rightly acknowledged is a “light” burden, Majority Op. 448-49.
2
Apart from being reasonable, a speech restriction in a nonpublic forum must also be viewpoint neutral. Pittsburgh League of Young Voters Educ. Fund v. Port Auth., 653 F.3d 290, 296 (3d Cir. 2011) (citing Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510). This means that if the government permits speech regarding a particular subject on government property, it must allow for the expression of all viewpoints on that subject. Cornelius, 473 U.S. at 806, 105 S.Ct. 3439. To do otherwise and deny access to a forum solely to suppress a point of view is “anathema to free expression and impermissible in both public and nonpublic fora.” Pittsburgh League, 653 F.3d at 296 (citing R.A.V. v. City of St. Paul, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)).
Here, the NAACP claims the Policy is not viewpoint neutral for two reasons: (1) the City distinguished between commercial and noncommercial advertisements for discriminatory reasons; and (2) it allows the City to post noncommercial advertisements while prohibiting private groups from doing so. For reasons I shall explain, I disagree.
i
According to the NAACP, the City intended to discriminate against views that run contrary to the City’s viewpoint when it enacted the Policy and this illicit motive requires the Policy’s invalidation. This argument is foreclosed by the NAACP’s facial challenge. Since the Policy excludes private speakers who agree with the City as well as those who disagree, it is facially neutral and our inquiry in that regard is complete. See Bailey v. Callaghan, 715 F.3d 956, 959-60 (6th Cir. 2013) (declining to look beyond the text of a facially-neutral statute to examine claims of improper legislative motive because “the law forecloses this kind of adventure”); Wisc. Educ. Ass’n Council v. Walker, 705 F.3d 640, 648-53 (7th Cir. 2013) (same). And even assuming, arguendo, that the City had such a motive and that an inquiry into the City’s motivations is permissible in the context of this facial challenge, the NAACP’s argument still fails.
To the NAACP, motive is relevant because “the line between viewpoints and subjects is such an elusive one” and “classifying a particular viewpoint as a subject rather than as a viewpoint on a subject” can be a tactic to impermissibly exclude unwanted viewpoints from a particular forum. See NAACP Br. 44 (quoting Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth., 100 F.3d 1287, 1298 (7th Cir. 1996)). While this reasoning could support an argument that “noncommercial speech” is actually a viewpoint rather than a subject matter which may be banned, the NAACP neither makes this argument nor would it be supported by caselaw. See, e.g., Leh *456 man, 418 U.S. at 303-04, 94 S.Ct. 2714 (upholding a regulation that banned political and issue-based advertising); Pittsburgh League, 653 F.3d at 297 (noting that rejecting advertisements because of their noncommercial character is viewpoint neutral); Children of the Rosary, 154 F.3d at 975, 980-81 (finding a regulation permitting only commercial advertising on buses viewpoint neutral); Lebron v. Nat’l R.R. Passenger Corp. (Amtrak), 69 F.3d 650, 653, 656-59 (2d Cir. 1995) (finding a regulation permitting only commercial advertising on a large billboard viewpoint neutral). And to the extent the NAACP argues that an illicit motive alone is sufficient to invalidate a policy, I cannot agree because the Supreme Court has stated otherwise. See United States v. O’Brien, 391 U.S. 367, 383, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (“It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.”); see also Children of the Rosary, 154 F.3d at 980 (stating that motive alone “is not dispositive when there is no indication that the city is implementing the standard in a viewpoint discriminatory manner that reflects an intent to use the policy to exclude disfavored perspectives on the issues”); cf. Cornelius, 473 U.S. at 811-13, 105 S.Ct. 3439 (questioning the viewpoint neutrality of a regulation in light of allegations of both improper motive and viewpoint discriminatory application). “A fagade for viewpoint discrimination, in short, requires discrimination behind the fagade.” Grossbaum, 100 F.3d at 1292-94, 1296-98.
ii
The NAACP also argues that the Policy discriminates on the basis of viewpoint because it allows the City to post noncommercial advertisements despite forbidding private advertisers from doing the same. According to the NAACP, the Policy is a fagade for viewpoint discrimination because the City may speak on issues such as the value of beer brewing, but the Policy would prohibit a temperance organization from posting a countervailing advertisement. In response, the City seeks refuge in the government speech doctrine. On this close question, I believe the City has the better argument.
According to the government speech doctrine, “when [the] government speaks, it is not barred by the Free Speech Clause from determining the content of what it says.” Walker, 135 S.Ct. at 2245. Rather, “[t]he Free Speech Clause restricts government regulation of private speech.” Pleasant Grove City v. Summum, 555 U.S. 460, 467, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009). And when the government speaks, “the First Amendment strictures that attend the various types of government-established forums do not apply.” Walker, 135 S.Ct. at 2250. Instead, “the democratic electoral process ... provides a check on government speech.” Id. at 2245.
Based on these statements, our inquiry into the viewpoint neutrality of the Policy ,is straightforward. Limiting the field of the City’s speech in this area would appear to be foreclosed by Summum and Walker, both of which make clear that the strictures of the Free Speech Clause do not apply to government speech. Walker, 135 S.Ct. at 2245-46, 2250; Summum, 555 U.S. at 467-69, 129 S.Ct. 1125. For this reason, I would find the Policy’s exception for government noncommercial speech permissible. I say this with some hesitation, however, because both .Summum and Walker focused on whether all the speech in a given venue constituted private speech or government speech. Unlike those cases, here the City’s speech occurs in a venue shared by the government and private speakers alike. This difference raises a number of unique concerns not directly at issue in Summum and Walker.
*457 For 'instance, with the government and private parties sharing the same venue, passersby may have difficulty identifying who is responsible for displaying any particular message. At this point, the check provided by the democratic process largely disappears, as the ability to discern the City’s speech is impaired.
In addition, with the power to express noncommercial positions and exclude those to the contrary, the City could create an environment in which passersby are led to believe that the City’s positions are uncontested. It may appear that the opportunity to contest the government’s message exists by posting an opposing advertisement on the wall monitors, but that no one has done so. This illusion of consensus, which uniquely threatens the marketplace of ideas, is similar to the concern Justice Alito warned of in his dissent in Walker. See 135 S.Ct. at 2255-56 (arguing that the Court’s understanding of the government speech doctrine may permit the government to erect electronic billboards, post its own messages on them, simultaneously display only those private advertisements it approves of, and avoid the First Amendment by asserting all of the speech emanates from the government). In response to that concern, the Court has instructed that when the government speaks, “it is not barred by the Free Speech Clause from determining the content of what it says” and “the First Amendment strictures that attend the various types of government-established forums do not apply.” Walker, 135 S.Ct. at 2245, 2250. Based on that directive, I must conclude that the Policy does not implicate viewpoint discrimination concerns that would plainly exist if private speech were at issue.
For the reasons stated, I would reverse the District Court’s order and enter summary judgment for the City of Philadelphia.

. While the City has proffered two rationales for upholding its ban — avoiding controversy and maximizing revenue — only one such justification is required to find it constitutional. Because I accept the controversy avoidance rationale, I address it alone and do not analyze the City’s revenue maximization arguments.

. NAACP, Misplaced Priorities (May 2011), available at http://www.naacp.org/pages/ misplaced-priorities.

.The Majority neglects to mention the heavy burden facing those who bring a facial challenge, even in the First Amendment context. See Wash. State Grange, 552 U.S. at 449-51, 128 S.Ct. 1184. Consequently, much of the reasoning it uses to find the Policy facially unconstitutional relies on the absence of record, evidence and permissible inferences establishing the purpose of the forum and the connection between the Policy and that purpose. Majority Op. 445-48. The Majority's holding implies that even if Airport executives tomorrow wrote ap identical policy and explained that the purpose of the advertising space is to promote a comfortable and noncontroversial atmosphere and that a ban on noncommercial advertisements would further this goal, the new policy could not be constitutional. While such a result is required by the Majority’s facial invalidation of the Policy, it would not be supported by its reasoning which dictates that outcome.

. Without resolving the matter, I will refer to the forum here as a nonpublic forum.

. The Supreme Court recently noted that there are four types of forums: (1) traditional public forums; (2) designated public forums; (3) limited public forums; and (4) nonpublic forums. Walker v. Texas Div., Sons of Confederate Veterans, Inc., — U.S. -, 135 S.Ct. 2239, 2250-51, 192 L.Ed.2d 274 (2015). I disagree with the Majority’s opinion to the extent it suggests otherwise. See Majority Op. 441 & n.2.

. The Majority’s rationale for declining to infer that one purpose of the forum was to create a congenial environment is in error. According to the Majority, there is "no reason to doubt the City does try to maintain a ‘soothing and pleasing’ environment.’’ Majority Op. 447. Instead of stopping here and determining whether this fact supports an inference that the advertising space shares this purpose, the Majority goes on to add to this purpose a desire to ban noncommercial advertising to avoid controversy. And from this, the Majority concludes that since there is no ban on noncommercial advertising throughout the Airport, no inference can be made that the advertising space would have such a purpose. Id. at 447-48. In doing so, the Majority confuses the purpose of the forum — to create a soothing or congenial atmosphere— with the means of achieving that goal — banning noncommercial advertising. Because the latter does not illuminate the purpose of the forum, it should not be considered while attempting to discern as much. And while it is true that the parts of the Airport leased to others are not encumbered by the Policy’s prohibition of noncommercial advertising, this concern is properly analyzed when considering whether the Policy is reasonable in light of all the surrounding circumstances, not in determining the purpose of the forum.

. To the extent the District Court and the NAACP claim that the City must show that noncommercial advertisements would disrupt the Airport’s functioning, I disagree. Because the forum at issue here is the monitors, the City must show only that noncommercial messages interfere with the goal of promoting a comfortable environment.

. I disagree with the NAACP’s characterization of Lehman s "captive audience” analysis. See Children of the Rosary, 154 F.3d at 977 (rejecting a similar argument).