PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 15-1002

———————

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE

v.

CITY OF PHILADELPHIA,

Appellant

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-11-cv-06533)
District Judge: Honorable Cynthia M. Rufe

———————

Argued October 8, 2015

Before: McKEE, <u>Chief Judge</u>, AMBRO,
and HARDIMAN, <u>Circuit Judges</u>

(Opinion filed:  August 23, 2016)

Shelley R. Smith
  City of Philadelphia Solicitor
Elise M. Bruhl
Craig R. Gottlieb, Esquire          (Argued)
City of Philadelphia
Law Department
1515 Arch Street
One Parkway
Philadelphia, PA 19102

       Counsel for Appellant

Laura Kessler
Fred T. Magaziner   (Argued)
Catherine V. Wigglesworth, Esquire
Dechert
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA 19104

Mary Catherine Roper
American Civil Liberties Foundation of Pennsylvania
P.O. Box 40008
Philadelphia, PA 19106

Seth F. Kreimer
3400 Chestnut Street
Philadelphia, PA 19104

       Counsel for Appellee

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

The City of Philadelphia has a written policy preventing private advertisers from displaying non-commercial content at the Philadelphia International Airport. The City, which owns the Airport, says the policy helps it further its goals of maximizing revenue and avoiding controversy. The record, however, reveals substantial flaws in those justifications. The City acknowledges the flaws but nonetheless maintains that the ban on non-commercial ads is a reasonable use of governmental power. It is not. Because the ban is unreasonable, it violates the First Amendment and cannot be enforced as written. The District Court reached the same conclusion, and we therefore affirm.

## I. Background

*A. The City's policy*

The City has long accepted paid advertisements that are posted in display cases and on screens throughout the Airport. In January 2011, the National Association for the Advancement of Colored People submitted an ad for display at the Airport. It offered to pay the prevailing market rate for the ad, which read: "Welcome to America, home to 5% of the world's people & 25% of the world's prisoners. Let's build a better America together. NAACP.org/smartandsafe." At the time the City did not have a written policy governing the types of ads it would display at the Airport. It nonetheless rejected the submission based on an informal practice of only accepting ads that proposed a commercial transaction.

3

The NAACP filed a lawsuit in October 2011 claiming that the City's rejection of its ad violated the First Amendment and seeking declaratory and injunctive relief. In March 2012, while the lawsuit was pending, the City adopted the written policy now before us. It states that ads that do not "propose a commercial transaction" cannot be approved. "[C]ommercial transaction" is not defined. Other categories of ads that cannot be displayed are those: 1) "relating to the sale or use of alcohol or tobacco products"; 2) containing "sexually explicit representations and/or relat[ing] to sexually oriented businesses or products"; and 3) "relating to political campaigns." There is an exception that allows the City to post non-commercial ads promoting subjects that include Philadelphia tourism, City initiatives, air service, and use of the Airport. The policy only covers the Airport's advertising space. In other areas of the Airport, travelers see a wide range of non-commercial content. For instance, there are televisions and newsstands throughout, often in close proximity to ads governed by the policy.

The City argues that the ban on non-commercial content[1] maximizes revenue and avoids controversy. Specifically, it maintains that displaying non-commercial ads, which might relate to religious or social issues, could jeopardize revenue from companies that do not want their content posted near potentially divisive messages. Similarly, the City contends that accepting non-commercial ads might expose travelers to content they find offensive.

---

[1] Because the exception allowing City-sponsored non-commercial content does not bear on our analysis, we hereafter describe the policy as imposing a ban without reference to the exception.

In connection with the adoption of the written policy, the City agreed to display the NAACP's ad for three months and to pay the organization $8,800 in attorney's fees. The parties also agreed that the NAACP would file an amended complaint to challenge the newly adopted policy. It did so in August 2012. The amended complaint presents a facial challenge to the ban on non-commercial content. There is no challenge to any other portion of the policy.

*B. Deposition testimony*

As part of discovery in the lawsuit, the NAACP deposed James Tyrrell, the Airport's Deputy Director of Aviation and Property Management/Business Development. The City designated Tyrrell, pursuant to Federal Rule of Civil Procedure 30(b)(6), to testify on its behalf on numerous topics, including the "reason or purpose and the factors considered by the City for its decision to adopt, create, enact or promulgate the [written policy], and any communications concerning that decision." Despite this designation, Tyrrell could not offer any conclusive explanation for why the City adopted the ban on non-commercial content. Indeed, asked whether he had "an understanding" of the reason for distinguishing between commercial and non-commercial ads, he responded that he did not.

Because the City defends the ban on the grounds of revenue maximization and controversy avoidance, Tyrrell's testimony on these points merits a detailed discussion. With respect to revenue, he said that the purpose of allowing advertising in the Airport is to make money. He had two opportunities during his deposition to discuss any connection that might exist between the ban and this goal. First, when asked specifically about the NAACP's ad, Tyrrell testified that it was not "consistent with the message that the [A]irport wants to deliver in terms of promoting tourism, promoting the

5

region and making it a very hospitable place. Advertisers look at that as well." However, asked whether he had any reason "beyond the realm of conjecture and speculation" to think that displaying the ad might cost the Airport revenue, Tyrrell conceded that he did not.

On the second occasion, Tyrrell disowned the notion that the policy was motivated by revenue concerns. The following exchange is particularly instructive:

> Q [by Fred Magaziner, attorney for NAACP]: In determining that it was prudent and the time had come to adopt [the written] policy, was one of your purposes to prevent loss of revenue from commercial advertisers?
>
> [Objection]
>
> A [by Tyrrell]: No.
>
> . . .
>
> Q: And that distinction that the policy draws between [commercial and non-commercial ads], that has nothing to do with revenue; correct?
>
> A: I do not believe so, no.
>
> Q: You do not believe it has anything to do with revenue?
>
> A: No.

As part of that same exchange, he also suggested that the policy might even cost the City money because it forces the Airport to turn away willing advertisers. Asked whether he

6

would be "happy" from a business perspective selling non-commercial ads, he said that he would be.

Meanwhile, Tyrrell also offered testimony relevant to the theme of avoiding controversy. Though that term can mean many things, his testimony sharply limited the possibilities. For instance, one possible meaning might be that the City is concerned about the risk of attribution if it permitted non-commercial ads to be displayed. In particular, it might be worried that passersby would assume that the City, which owns the advertising space, endorses the views of non-commercial advertisers. But Tyrrell testified that he had no reason to believe that the ban had anything to do with maintaining a neutral position for the City on issues of non-commercial speech. Another possibility might be that the ban, under which all non-commercial ads are rejected, prevents the City from playing favorites by accepting messages it likes while turning away ones it does not. Yet, asked if avoiding the appearance of favoritism or minimizing the chances for abuse motivated the ban, Tyrrell said that he did not have any reason to think so. He gave the same answer when asked whether the ban related to a desire not to impose on captive audiences (*i.e.*, people who are in the Airport by necessity and cannot avoid the messages merely by going somewhere else).

The only possibility not eliminated was that non-commercial ads might be more likely than commercial ones to offend travelers. This is the theory the City advances on appeal. Tyrrell testified that this "may" have something to do with the adoption of the ban. However, he said that he did not recall if this idea had "ever been discussed in any meeting or conversation" that he had. And he admitted it was something he just thought of as he sat for his deposition.

Finally, Tyrrell, on a general level, described the Airport as a "very stressful" place in light of the commotion

and anxiety that frequently accompany travel. As a result, management makes "a very concentrated and huge effort to keep everything positive, everything non-controversial, and just create an environment that is soothing and pleasing."

*C. The City's position*

The City initially argued (at least in its briefing) that its subjective intentions in adopting the ban were to maximize revenue and avoid controversy. *See* Appellant's Br. at 17–18. By the time of oral argument, however, it relied almost exclusively on the contention that its "actual thoughts and thinking" on the subject "don't matter." Oral Arg. Tr. at 7. The City also maintained that Tyrrell's testimony about the ban was irrelevant. *Id.* at 18 ("I don't think it matters what the witness says."). Moreover, it agreed that the reasons it was offering—revenue maximization and controversy avoidance—might be after-the-fact justifications that are "strictly in the realm of lawyer argumentation." *Id.* at 55; *see also id.* at 16–17 (asked if the City can invent justifications when writing its appellate briefs, counsel for the City answered yes). The City further conceded the possibility that its actual intent might have been to suppress viewpoints that cast Philadelphia or the region in a negative light. *Id.* at 16 (noting that its intent "might have been viewpoint discriminatory").

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction over the NAACP's First Amendment claims under 28 U.S.C. §§ 1331 and 1343. It issued two opinions. In the first it granted summary judgment to the NAACP. *NAACP v. City of Philadelphia*, 39 F. Supp. 3d 611, 635 (E.D. Pa. 2014). And in the second it granted the NAACP declaratory relief and an injunction preventing the City from enforcing the ban as written.

8

*NAACP v. City of Philadelphia*, Civ. No. 11-6533, 2014 WL 7272410, at *3 (E.D. Pa. Dec. 19, 2014). Per 28 U.S.C. § 1291, we have jurisdiction over the timely appeal of the latter ruling.

Our review is plenary. *See Aleynikov v. Goldman Sachs Group, Inc.*, 765 F.3d 350, 357 n.2 (3d Cir. 2014) ("Ordinarily we review a district court's grant of an injunction for abuse of discretion. But where . . . the injunction results [from] a summary judgment motion, our review is plenary.") (internal citation omitted); *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 174 n.17 (3d Cir. 2008) (plenary review over questions of law in connection with declaratory judgment actions).

Granting summary judgment "is appropriate if . . . there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." *State Auto Prop. & Cas. Ins. Co. v. Pro Design, P.C.*, 566 F.3d 86, 89 (3d Cir. 2009) (internal quotation marks omitted). Additionally,

> [a]lthough the non-moving party receives the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the non[-]moving party must point to some evidence in the record that creates a genuine issue of material fact. In this respect, summary judgment is essentially 'put up or shut up' time for the non-moving party: [it] must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.

*Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (internal citation omitted).

### III. Discussion

Our analysis proceeds in five parts. We begin with a discussion of the nature of the public property at issue. After laying that groundwork, we analyze who must bear the burden of proof. We then address the standards for meeting that burden. Next we apply the framework to our facts. Finally, we consider and reject a counterargument to our holding.

*A. Forum analysis*

Because this case involves a restriction on the types of speech allowed on public property, we begin with forum analysis. Though often complicated in practice, this analysis stems from a simple premise—not every public property is the same, and different types of property will require different treatment. As a result, the Supreme Court has grouped public properties along a spectrum.

On one end of the spectrum, we have traditional public forums. These properties, which include public streets and parks, "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (internal quotation marks omitted). Content-based speech restrictions in traditional public forums get strict scrutiny, which means that the government must show a compelling state interest and narrow tailoring of measures to achieve that interest (including the absence of less restrictive alternatives). *Id.*

In the middle, we have designated public forums. These are properties that have "not traditionally been

regarded as a public forum [but are] intentionally opened up for that purpose." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). As with traditional public forums, content-based restrictions get strict scrutiny. *Id.* at 469–70.

The final category is sometimes called a limited public forum and other times labeled a nonpublic forum. It is reserved for government properties that have not, as a matter of tradition or designation, been used for purposes of assembly and communication. These enjoy the least protection under the First Amendment. Content-based restrictions are valid as long as they are reasonable and viewpoint neutral. *See id.* at 470; *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985).[2] Unlike with strict scrutiny, this review does not require narrow tailoring or the absence of less restrictive alternatives. Indeed, the "Government's decision to restrict access . . . need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808 (emphasis in original). Moreover, the government's asserted interest in drawing content-based distinctions must be valid, but it does not have to be compelling. *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 106 (3d Cir. 2013).

Here the relevant forum is the Airport's advertising space (rather than the Airport in its entirety) because that is the specific public property that the NAACP seeks to access. *See Cornelius*, 473 U.S. at 801 (noting that in "defining the

---

[2] There has been some confusion about whether there are any practical differences between nonpublic and limited public forums. However, the Supreme Court recently "has used the term[s] . . . interchangeably . . .[,] thus suggesting that these categories of forums are the same." *Galena v. Leone*, 638 F.3d 186, 197 n.8 (3d Cir. 2011).

forum we have focused on the access sought by the speaker"); *see also Christ's Bride Ministries, Inc. v. Se. Pennsylvania Transp. Auth.*, 148 F.3d 242, 248 (3d Cir. 1998) (in case involving challenge to rejection of advertisements, defining forum as public transit system's advertising space rather than entirety of transit system). The District Court concluded that the advertising space is a limited public/nonpublic forum. *NAACP*, 39 F. Supp. 3d at 627.

We assume, without deciding, that the Court was correct.[3] That is because our conclusion that the ban on non-commercial content is unreasonable means that it is unconstitutional no matter what we label the forum. In other words, reasonableness is a bare minimum in forum cases. Some types of forums require more than reasonableness, but none allow less. *Cf. Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny County*, 653 F.3d 290, 296

---

[3] The Airport more broadly (as distinct from the advertising space) is also likely a limited public/nonpublic forum. Although airports are places where the public assembles, they are not traditional public forums. *See Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992) ("*ISKCON*") ("[G]iven the lateness with which the modern air terminal has made its appearance, it hardly qualifies for the description of having immemorially [and] time out of mind been held in the public trust and used for purposes of expressive activity.") (internal quotation marks omitted). And although it is conceivable that an airport could, under the right circumstances, become a designated public forum, the Supreme Court has said that this is unlikely. *See id.* at 682–83 (concluding that the John F. Kennedy, La Guardia, and Newark airports in New York and New Jersey, which are "far from atypical," are not designated public forums).

(3d Cir. 2011) ("*Pittsburgh*") (noting that we "need not tackle the forum-selection question" when a law or regulation would be invalid in any type of forum).

*B. Allocating the burden*

The core question for us is whether the City's ban on non-commercial content is reasonable. At the heart of this is the tension between its justifications on the one hand and the record that we have before us on the other. Typically, when the government exercises its police powers, the scrutiny we apply is rational-basis review. Under this standard, a "legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). One of the hallmarks of rational-basis review is that the challenger, not the government, bears the burden of establishing the unconstitutionality of a law or regulation. *See id.* at 314–15 ("On rational-basis review, [a statute] comes to us bearing a strong presumption of validity, and those attacking the rationality of [a] legislative classification have the burden to negat[e] every conceivable basis which might support it.") (internal citation and quotation marks omitted).

Though the City does not invoke rational-basis review by name, these are the standards it uses to support its reasonableness arguments. This no doubt has some surface appeal, as "reasonable" and "rational" are frequently used as synonyms. But rational-basis review is not just the sum total of the various dictionary definitions of the word "rational." Rather, it is a legal test that over time has developed certain characteristics—for instance, an allocation of the burden to the challenger and a strong presumption of validity. These requirements were developed to serve the circumstances in which courts apply rational-basis review—run-of-the-mill

13

exercises of police powers. *See Romer v. Evans*, 517 U.S. 620, 631 (1996) ("[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold [a] legislative classification so long as it bears a rational relation to some legitimate end.").

By contrast, when a law or regulation burdens a fundamental right such as the First Amendment, rational basis yields to more exacting review. Indeed, it has been the Supreme Court's "consistent position that democracy stands on a stronger footing when courts protect First Amendment interests against legislative intrusion, rather than deferring to merely rational legislative judgments in this area." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 519 (1981) (plurality opinion). Thus, unlike with rational-basis review, when "the Government restricts speech, [it] bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000). This is so because the "presumption of validity that traditionally attends [the exercise of police powers] carries little, if any, weight where the . . . regulation trenches on rights of expression protected under the First Amendment." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 77 (1981) (Blackmun, J., concurring).

Neither the Supreme Court nor our Court has expressly decided the allocation of the burden to establish reasonableness in a limited public or nonpublic forum.[4] This

---

[4] We note that *dicta* from our Court goes in both directions. *Compare United States v. Marcavage*, 609 F.3d 264, 275 (3d Cir. 2010) (suggesting that the government bears the burden), *with Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1371 (3d Cir. 1990) (likening the review to a rational-basis test). Both statements were *dicta* because we ultimately determined

14

is not surprising. Reasonableness is a relatively low bar, and in most instances the technical question of who bears the burden will not be consequential because the law or regulation would survive either way. But this is not a normal case, as the record here is strangely void of support for the City's ban.

With the question now before us for the first time, we see no reason why the *Playboy Entertainment Group* rule would not apply. Even in limited public and nonpublic forums, First Amendment protections still exist. *See, e.g.*, *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 131 n.7 (1981) ("The First Amendment['s] . . . ramifications are not confined to the public forum . . . .") (internal quotation marks omitted); *Pittsburgh*, 653 F.3d at 299 (assuming that the forum was nonpublic and striking down on First Amendment grounds the rejection of an advertisement). This is sufficient to shift the burden from the challenger to the City. It is true that the burden the City shoulders is "much more limited" than, for instance, strict (or even intermediate) scrutiny. *ISKCON*, 505 U.S. at 679. But the burden, however limited, is still the City's to meet.

This jibes with how some of our sister courts have defined reasonableness. *See, e.g.*, *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 966–67 (9th Cir. 2002) ("The 'reasonableness' requirement for restrictions on speech in a nonpublic forum requires more of a showing than does the traditional rational basis test; *i.e.*, it is not the same as establish[ing] that the regulation is rationally related to a legitimate governmental objective, as might be the case for the typical exercise of the government's police power.") (internal quotation marks omitted) (alternation in original),

that neither case involved a limited public or nonpublic forum.

*abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *Multimedia Pub. Co. of S.C. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 159 (4th Cir. 1993) ("[I]t isn't enough simply to establish that the regulation is rationally related to a legitimate governmental objective, as might be the case for a typical exercise of the government's police power, for this regulation affects protected First Amendment activity that is entitled to special solicitude even in this nonpublic forum.") (internal citation omitted).

*C. How to meet the burden*

The next logical question is how the City can satisfy its burden to show that the ban on non-commercial content is reasonable. Our review of a trio of Supreme Court opinions, all written by Justice O'Connor, demonstrates that there are two ways it can do so: record evidence or commonsense inferences.

In the first case, *Cornelius*, which involved restrictions on participation in a charitable campaign in the federal workplace, the Court framed the reasonableness test for limited public and nonpublic forums as follows: "The reasonableness of the Government's restriction of access . . . must be assessed in the light of the purpose of the forum and all the surrounding circumstances." 473 U.S. at 809. In applying this framework, the Court focused on the record evidence before it. *See, e.g.*, *id.* at 808 ("*Based on the present record*, we disagree and conclude that respondents may be excluded from the [forum].") (emphasis added); *id.* at 811 ("*On this record*, the Government's posited justifications for denying respondents access to the [forum] appear to be reasonable in light of the purpose of the [forum].") (emphasis added).

16

The next case, *United States v. Kokinda*, 497 U.S. 720 (1990), showed that not every conclusion needs to be backed up by evidence. Justice O'Connor, writing for a plurality, clarified that courts can use "common-sense" to "uphold a regulation under reasonableness review." *Id.* at 734–35 (plurality opinion) (internal quotation marks omitted). *Kokinda* came about because the Postal Service, after years of trying to allow some types of solicitation of money on its property while precluding others, found that this approach was unworkable and that the better course was to prohibit all solicitation. The resulting regulation was supported by a thorough record, but for one point—the notion that solicitation is more disruptive than handing out literature—the plurality said that judges need look no further than logic and experience. *Id.*

The final piece of the puzzle is Justice O'Connor's concurring opinion in *ISKCON*. There was a majority opinion written in that case by Chief Justice Rehnquist upholding a solicitation ban at three airports run by the Port Authority of New York and New Jersey. Meanwhile, a majority of the Court agreed that restrictions on distributing leaflets at those same airports were invalid, but the justices could not agree on a rationale. In these situations, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 764 n.9 (1988) (internal quotation marks and alternation omitted). Justice O'Connor's views on leafleting were the narrowest and therefore speak for the Court. *See, e.g.*, *New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 20 n.5 (1st Cir. 2002) ("Because Justice O'Connor's *ISKCON* concurrence constitutes the narrowest ground for the decision, it is the most authoritative pronouncement on the standards applicable to [leafleting] in a non-public forum."); *Hawkins v.*

17

*City & County of Denver*, 170 F.3d 1281, 1289 (10th Cir. 1999) (same).

The portion of her opinion dealing with leafleting makes clear that, whether the support comes from record evidence or common sense, courts must have some way of evaluating restrictions. The opinion contrasted the facts of that case, where there was no "record evidence to support [the leafleting] ban," with those of *Cornelius*, where "the record amply support[ed]" the restriction on speech, and those of *Kokinda*, where the solicitation ban was based on "the Postal Service's 30-year history of regulation." *ISKCON*, 505 U.S. at 691–92 (O'Connor, J., concurring and concurring in judgment) (internal quotation marks omitted) (second alternation in original).

As Justice O'Connor explained, although the government does not need to prove that a particular use will actually disrupt the "intended function" of its property, *id.* at 691 (quoting *Perry*, 460 U.S. at 52 n.12) (internal quotation marks omitted), "we have required some explanation as to why certain speech is inconsistent with the intended use of the forum," *id.* at 691–92. The opinion goes on to hold that the leafleting ban was unreasonable because "the Port Authority has provided no . . . reason for prohibiting leafleting, and the record contains no information from which we can draw an inference that would support its ban." *Id.* at 692.

To synthesize, then, the City has a two-step burden that it can satisfy using record evidence or commonsense inferences. First, given that reasonableness "must be assessed in the light of the purpose of the forum and all the surrounding circumstances," *Cornelius*, 473 U.S. at 809, the evidence or commonsense inferences must allow us to grasp the purpose to which the City has devoted the forum. *See also*

*Greer v. Spock*, 424 U.S. 828, 836 (1976) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.") (internal quotation marks omitted). And second, the evidence or commonsense inferences also must provide a way of tying the limitation on speech to the forum's purpose. The City need not prove that the banned speech would cause harm if permitted, but per *ISKCON* it must provide a legitimate explanation for the restriction. In this context, we proceed to analyze the City's ban on non-commercial content.

*D. Applying the standards*

The City has argued that its objectives for the advertising space are revenue maximization and controversy avoidance and that the ban furthers them. Both justifications suffer from a lack of record evidence. And even with the benefit of commonsense inferences, neither passes muster.

As for revenue, Tyrrell testified that the City allows advertising in order to make money, and there is nothing to suggest otherwise. As such, the City has met the first part of its burden, which is to establish that revenue maximization is a purpose of the forum. But where things start to break down for the City is that there is no record evidence showing that the ban is reasonably connected to this goal. Although Tyrrell testified that advertisers "look at" the types of ads posted in the Airport to determine whether they would want to advertise in proximity to those messages, he made clear that the ban was not intended to promote revenue and that in practice it arguably costs the City money.

Whereas the revenue justification runs into trouble at step two (showing a connection between the restriction and the purpose), the controversy avoidance rationale hits a snag even earlier in the analysis. In light of Tyrrell's testimony, the

19

only controversy the City could be trying to avoid is travelers' exposure to non-commercial content they might find offensive. But no record evidence shows this is a purpose to which the City has devoted the Airport's advertising space. The City had ample opportunities in Tyrrell's deposition, as well as that of Mark Gale, the Airport's CEO, to provide support for this purported purpose. And even after the depositions, the City could have come forward with affidavits. But the record we have lacks any evidence that directly supports its argument on appeal. This harms the City's position because, although reasonableness review gives it the discretion to preserve a forum "for the use to which it is lawfully dedicated," *Greer*, 424 U.S. at 836 (internal quotation marks omitted), this presupposes that it actually has dedicated the property to that particular use, and we have no evidence that this occurred here.

The City's failure to produce record evidence to clear step two on revenue maximization and step one on controversy avoidance could be excused if commonsense inferences supported its theory of the case. But they do not. In light of the testimony and the surrounding circumstances, an appeal to common sense cannot salvage the ban.

Given Tyrrell's testimony that the ban is unrelated to revenue and arguably costs the City money, logic does not allow an inference that it is reasonably connected to revenue maximization. Indeed, what makes this case so unusual is that the record belies the inference the City wants us to draw. The City says we can ignore this and pretend Tyrrell's deposition never occurred. This Alice-in-Wonderland argument misses the mark. The ability to use common sense is not a license to close our eyes and suspend disbelief. In other words, we cannot conclude that the ban serves a purpose that the City's own representative has already disclaimed.

As for avoidance of controversy, inferences cannot help the City get past the first step of the inquiry—demonstrating that it has dedicated the advertising space to keeping travelers from seeing potentially offensive non-commercial content. We note at the outset that, although the City is permitted under the right circumstances to dedicate a limited public or nonpublic forum to controversy avoidance, this objective is nebulous and not susceptible to objective verification. As a result, Supreme Court guidance cautions against readily drawing inferences, in the absence of evidence, that controversy avoidance renders the ban constitutional. *See, e.g.*, *Cornelius*, 473 U.S. at 812 ("[T]he purported concern to avoid controversy excited by particular groups may conceal a bias against the viewpoint advanced by the excluded speakers."); *Metromedia*, 453 U.S. at 510 (plurality opinion) (noting that judgments that are "necessarily subjective, defying objective evaluation . . . must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose"). This is particularly apt here because the City has conceded that its justifications might be after-the-fact rationalizations. *See* Oral Arg. Tr. at 16–17.[5] Against this backdrop, the inference that the City wants us to draw is without support.

---

[5] Q: But you're telling us right now—the reasons for the written policies were enhanced revenue and avoid[ance] [of] controversy. And those are good reasons, but you've got to supplement them by something, some support in the record.
A: No, you don't, actually. That's—that's—
Q: You don't?
A: You don't. That is the key. The [C]ity is—
Q: You can make it up now?
A: Well, I—perhaps in the trial—
. . .

The only possible basis for an inference would be general testimony about the Airport. For instance, the City highlights Tyrrell's testimony that the Airport is a "very stressful" place, and hence there must be "a very concentrated and huge effort to keep everything positive, everything non-controversial, and just create an environment that is soothing and pleasing." This testimony does not relate specifically to the Airport's advertising space, but rather speaks to that facility more broadly, of which the advertising space is but a small part. From this the City asks us to draw an inference that its asserted justification—preventing exposure to potentially offensive messages—is consistent with a purpose of the advertising space.

But if the City seeks to justify its regulation of the advertising space by reference to its goals for the entire Airport, then we should consider whether the atmosphere in the rest of the Airport supports such an inference. *See, e.g.*, *Cornelius*, 473 U.S. at 801–02 (looking to the "the special nature and function" of the broader property in which the forum is located). Elsewhere in the Airport, travelers have frequent exposure to televisions broadcasting shows and commercials containing a wide variety of non-commercial content. For instance, the NAACP submitted pictures of the Airport's televisions that show content related to a gubernatorial election in Virginia, the war on drugs, the Confederate flag, and a piece of anti-discrimination legislation. And as they pass by newsstands, travelers can see magazines and newspapers displaying the very types of non-

---

Q: Or when you write your brief.
A: Correct.
Q: Because no matter what you write you can make it up . . . .
A: Well, I mean, this is not an unusual phenomenon. . . .

commercial information that the City seeks to exclude from its advertising space.

All of this indicates that there is little logic to the inference the City asks us to draw. Although we have no reason to doubt that the City does try to maintain a "soothing and pleasing" environment in the Airport, that broader effort apparently does not involve shielding travelers from non-commercial content on the ground that it might offend them. Instead, the Airport exposes them to an onslaught of non-commercial content outside of its advertising space without any suggestion that doing so is inconsistent with the environment it seeks to foster.

The City's argument is essentially that common sense supports the inference that it would devote its advertising space to a purpose to which the rest of the Airport does not subscribe. Given that the advertising space is physically part of the Airport, this argument fails. As the D.C. Circuit has noted in a similar context:

> Although we readily acknowledge the fact that the airports' advertising facilities are physically distinct parts of the terminals . . .[,] we note that these facilities are for the most part physically 'separated' from the terminals only by glass panels or translucent plexiglass whose sole purpose is to frame or project messages of outside organizations to the terminals' . . . users. . . . Given this context, the display advertising areas at [the airports] cannot be wholly divorced—by structure, function, or fiat—from the nature of the [locations] in which they [exist].

*U.S. Sw. Africa/Namibia Trade & Cultural Council v. United States*, 708 F.2d 760, 764–66 (D.C. Cir. 1983), *abrogated on other grounds by ISKCON*.

In sum, the City has not presented record evidence sufficient to demonstrate that its ban is reasonable. Nor does the record permit us to draw that inference using common sense. As a result, the ban violates the First Amendment.

*E. The City's counterargument*

The City relies heavily on previous cases in which courts have examined commercial/non-commercial distinctions. This reliance is misplaced. Reasonableness is a case-specific inquiry, meaning that previous examples are of limited usefulness. And, under our facts, the City's ban is unreasonable.

In distinguishing between commercial and non-commercial content, the City was by no means writing on a blank slate. In *Lehman v. City of Shaker Heights*, the Supreme Court upheld as reasonable such a distinction for advertisements on a city's bus system. 418 U.S. 298, 304 (1974) (plurality opinion) ("The city consciously has limited access to its transit system advertising space in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience. These are reasonable legislative objectives advanced by the city in a proprietary capacity."); *id.* ("Revenue earned from long-term commercial advertising could be [jeopardized] by a requirement that short-term candidacy or issue-oriented advertisements be displayed on car cards."). However, *Lehman* does not help the City. As discussed, the NAACP asked Tyrrell about each of the factors from that case—minimizing abuse, avoiding favoritism, not imposing on a

captive audience, and maximizing revenue—and he disclaimed all of them.[6]

The City also cites decisions of our sister courts labeling as reasonable distinctions on transit systems between commercial and non-commercial advertisements. *See, e.g.*, *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 979 (9th Cir. 1998); *Lebron v. Nat'l R.R. Passenger Corp. (Amtrak)*, 69 F.3d 650, 653 (2d Cir.), *opinion amended on denial of reh'g*, 89 F.3d 39 (2d Cir. 1995). Additionally, in *Pittsburgh* we struck down a commercial/non-commercial distinction as viewpoint discriminatory but noted that under the right circumstances such a provision might be constitutional. 653 F.3d at 299. However, none of this relieves us of our obligation to determine reasonableness on a case-by-case basis in light of the facts and circumstances of each particular forum. *Cf. Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chicago*, 45 F.3d 1144, 1159 (7th Cir. 1995) ("This [reasonableness] inquiry requires an examination of both the governmental interest and the particular forum's nature and function. The fact that *Lehman*

---

[6] *Lehman* was a plurality opinion. Justice Douglas provided the fifth vote for the outcome in a concurring opinion that focused heavily on the issue of captive audiences. *See id.* at 308 (Douglas, J., concurring in judgment) ("Since I do not believe that petitioner has any constitutional right to spread his message before this captive audience, I concur in the Court's judgment."). The parties dispute the extent to which *Lehman*, in light of Justice Douglas's opinion, should be limited to situations that present a captive audience. However, given that none of the interests served by the ban in *Lehman* are implicated in this case, we do not weigh in on this.

upheld a policy of excluding political advertisements in public buses hardly determines the reasonableness of such a restriction for all time. Instead, the reasonableness of [a restriction] must be judged in light of the nature and purpose of the [forum].") (internal citations omitted). For the reasons previously discussed, the City's ban fails this test.

*　　*　　*　　*　　*

No matter the type of forum, restrictions on speech on government property must be reasonable. The City's ban on non-commercial ads at the Airport is unreasonable because it is not supported by the record or by commonsense inferences. The burden to establish reasonableness is a light one, but the City has failed to meet it here.[7] We need not determine

---

[7] Apart from reasonableness, a second requirement that exists no matter how we label the forum is viewpoint neutrality. *Cornelius*, 473 U.S. at 800. Because unreasonableness is sufficient by itself to render the policy unconstitutional, we do not reach the viewpoint question. We note nonetheless that the issue may be a closer call than our dissenting colleague suggests. As discussed, the City has conceded that the policy might have been motivated by an animosity toward certain viewpoints. The dissent, relying on the "familiar principle of constitutional law that [we] will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive," *United States v. O'Brien*, 391 U.S. 367, 383 (1968), says that this does not matter. But in *Cornelius* the Court suggested that a restriction will be unconstitutional if it was "impermissibly motivated by a desire to suppress a particular point of view." 473 U.S. at 812–13. Indeed, Justice Stevens's dissent clarified that "[e]veryone on the Court agrees that [a restriction] is prohibited by the First

26

whether the ban could survive on a different record; contrary to our dissenting colleague's suggestion, *see* Dissent at 6 n.3, we take no position on this question. Our inquiry is limited to what is before us, and on that record the ban does not survive. As a result, we affirm the District Court's grant of declaratory and injunctive relief.[8]

---

Amendment if it is motivated by a bias against the views of the excluded groups." *Id.* at 833 (Stevens, J., dissenting). Though some courts appear to say that motive is not enough and that there must be evidence that the restriction is being implemented in a discriminatory way, *see* Dissent at 15, we have never so held. As such, we note that this remains an open question in our Court.

[8] The District Court's grant of relief also covered an unwritten policy under which the City rejected advertisements that did not "support the mission" of the Airport. *NAACP*, 2014 WL 7272410, at *3. In the District Court, the City denied that the unwritten policy existed. However, it has said on appeal that it does not seek reversal of the Court's ruling on the unwritten policy if we affirm with respect to the written policy. *See* Appellant's Br. at 24. Because the City has waived any challenge to the unwritten policy as distinct from the written one, we affirm the Court's entry of judgment in its entirety without separately considering the unwritten policy.

*National Association for the Advancement of Colored People v. City of Philadelphia*, No. 15-1002

HARDIMAN, *Circuit Judge*, dissenting.

"[T]he government, 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985) (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)). In this appeal, the Court deprives the City of Philadelphia of this power by finding its ban on noncommercial advertising in parts of its airport facially invalid because the prohibition lacks record and common sense support. Because I view the City's restriction a reasonable attempt to avoid controversy at the airport, I respectfully dissent.[1]

I

A

In 2011, the NAACP released a report entitled *Misplaced Priorities* which described the disparity between government spending on prisons and education in cities such as Philadelphia, New York, and Los Angeles.[2] In anticipation

---

[1] While the City has proffered two rationales for upholding its ban—avoiding controversy and maximizing revenue—only one such justification is required to find it constitutional. Because I accept the controversy avoidance rationale, I address it alone and do not analyze the City's revenue maximization arguments.

[2] NAACP, *Misplaced Priorities* (May 2011), *available at* http://www.naacp.org/pages/misplaced-priorities.

of the report's release, the NAACP planned a broad advertising campaign, which included a series of advertisements at the Philadelphia International Airport (the Airport).

The Airport is 3,254,354 square feet and includes seven terminals and 126 boarding gates. Like all large airports, it contains numerous retail businesses and various kiosks filled with advertisements targeting travelers. The City of Philadelphia, which owns and operates the Airport, maintains over 100 wall-mounted flat screen monitors to display advertisements.

The NAACP sought permission to run an advertisement for *Misplaced Priorities* on two of the Airport's monitors. The advertisement featured a silhouette of the Statue of Liberty next to a block of text that read: "Welcome to America, home to 5% of the world's people & 25% of the world's prisoners." NAACP Br. 10. Beneath this text, the advertisement contained an additional sentence reading: "Let's build a better America together. NAACP.org/smartandsafe." *Id.* The City refused to display the NAACP's advertisement. And it did so even though the City had no written policy governing the rejection of advertisements and despite the fact that it had previously accepted issue-oriented advertisements.

In October 2011, the NAACP filed suit in the United States District Court for the Eastern District of Pennsylvania alleging that the City's rejection of its advertisement violated the First Amendment. Almost six months later, the City issued a written policy (the Policy) regulating advertising at the Airport. Most relevant here, the Policy prohibited private parties from displaying advertisements "that **do not** propose a

2

commercial transaction," but permitted the City to post messages promoting "the greater Philadelphia area" as well as "[o]ther City initiatives or purposes." *NAACP v. City of Philadelphia*, 39 F. Supp. 3d 611, 623 (E.D. Pa. 2014) (alteration in original). Since the Policy's enactment, no private noncommercial advertisements have been displayed. Noncommercial messages created by the City have been posted, however.

Three months later, the City and the NAACP entered into an agreement permitting the *Misplaced Priorities* advertisement to run in the Airport. The parties also agreed that the NAACP would file an amended complaint to challenge the Policy. The NAACP's amended complaint alleged that the Policy was facially unconstitutional.

B

In the course of discovery in the District Court, the City's principal witness was James Tyrrell, the Airport's Deputy Director of Aviation, Property Management, and Business Development. As the City's Rule 30(b)(6) designee, Tyrrell testified on a number of topics, including "[t]he reason or purpose and the factors considered by the City for its decision to adopt, create, enact or promulgate the Airport Advertising Policy, and any communications concerning that decision." App. 775.

When asked why the NAACP's advertisement was rejected, Tyrrell responded that it did not comport with the Airport's mission "to create an attractive environment to . . . promote tourism. It's to create a family oriented environment. It is to promote the region, to attract customers to the region." App. 784; *see NAACP*, 39 F. Supp. 3d at 622–

3

23. He went on to say, when questioned whether the NAACP's advertisement was offensive, that the Airport "make[s] a very concentrated and huge effort to keep everything positive, everything non-controversial, and just create an environment that is soothing and pleasing." *NAACP*, 39 F. Supp. 3d at 623–24; App. 802. And when asked how a ban on noncommercial advertisements could promote this mission, Tyrrell responded,

> If you talk about a commercial ad where someone is selling a product or a service, that is pretty broadly known, accepted, generally not going to be offensive. If you're talking about a non-commercial ad that is maybe supporting a position of one group or another, that could tend to offend someone who is not in agreement with that position.

App. 808. Tyrrell admitted that he "could not recall" if he had ever discussed this justification in any meeting and that it was "just something he was thinking of" during his deposition. *Id.*

After discovery was completed, the City and NAACP filed cross-motions for summary judgment. To adjudicate the motions, the District Court determined that the relevant forum was the City-owned advertising space, not the Airport writ large or the many commercial business that lease space in the Airport. And it concluded that the advertising space was either a limited public forum or a nonpublic forum, but that it need not decide which because both types of forums operate under the same level of judicial scrutiny, *i.e.*, speech restrictions must be reasonable in light of the purposes of the forum and viewpoint neutral.

4

Starting with viewpoint neutrality, the Court held that neither party was entitled to summary judgment because material facts relative to the City's motive in enacting the Policy were disputed. It nevertheless concluded that the NAACP was entitled to summary judgment because the Policy was unreasonable.

The District Court's analysis began by identifying the purposes of the forum, one of which was "maintaining the Airport as a family friendly environment that casts a positive light on [Philadelphia] and the region." *NAACP*, 39 F. Supp. 3d at 628. In light of this purpose, the Court found the Policy's exclusion of noncommercial advertisements unreasonable because there was nothing to suggest that noncommercial advertisements are any more (or less) controversial than commercial advertisements. *Id.* at 629–30. The Court also determined that noncommercial advertisements were in no way incompatible with the Airport as a whole—given that the Airport "contain[ed] many adult-oriented potentially controversial media" in other spaces, restricting noncommercial advertisements in the advertising space would have no effect on the Airport's functioning. *Id.* Accordingly, the Court held the Policy unconstitutional on its face and entered summary judgment in favor of the NAACP.

II

The crux of the City's appeal is that the Policy is reasonable because it helps to create a comfortable environment at the Airport by avoiding controversy without discriminating against any viewpoint.

A

It is important to note at the outset that the NAACP has brought a *facial* challenge to the City's policy. "A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988)). "This is the most difficult challenge to mount successfully," and it "affects the burden on [the plaintiff]." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (en banc) (internal quotation marks omitted) (citation omitted). "A plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.,* that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (alteration in original) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).[3]

---

[3] The Majority neglects to mention the heavy burden facing those who bring a facial challenge, even in the First Amendment context. *See Wash. State Grange*, 552 U.S. at 449–51. Consequently, much of the reasoning it uses to find the Policy facially unconstitutional relies on the absence of record evidence and permissible inferences establishing the purpose of the forum and the connection between the Policy and that purpose. Majority Op. 19–24. The Majority's holding implies that even if Airport executives tomorrow wrote an identical policy and explained that the purpose of the advertising space is to promote a comfortable and noncontroversial atmosphere and that a ban on noncommercial advertisements would further this goal, the

B

The Constitution does not require the "Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius*, 473 U.S. at 799–800. "[N]o less than a private owner of property, [the government] has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* at 800 (quoting *Greer*, 424 U.S. at 836). To balance "the Government's interest in limiting the use of its property to its intended purpose" and "the interest of those wishing to use the property for other purposes," courts engage in forum analysis. *Id.*

Here, neither party challenges the District Court's determinations that: (1) forum analysis applies; (2) the relevant forum is the Airport's monitors; and (3) the forum is either a limited public forum or a nonpublic forum, both of which implicate the same level of scrutiny.[4] Accordingly, the City may restrict the content of speech so long as the restriction is "reasonable in light of the purpose served by the forum" and viewpoint neutral. *Rosenberger v. Rector &*

---

new policy could not be constitutional. While such a result is required by the Majority's facial invalidation of the Policy, it would not be supported by its reasoning which dictates that outcome.

[4] Without resolving the matter, I will refer to the forum here as a nonpublic forum.

*Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (quoting *Cornelius*, 473 U.S. at 804–06).[5]

1

To determine whether the Policy is "reasonable in light of the purpose served by the forum," we look to the "purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 806, 809. In evaluating the Policy's reasonableness, "we do not 'require that . . . proof be present to justify the denial of access to a nonpublic forum on grounds that the proposed use may disrupt the property's intended function,' [but] we have required some explanation as to why certain speech is inconsistent with the intended use of the forum." *Int'l Soc. for Krishna Consciousness v. Lee (ISKCON)*, 505 U.S. 672, 691–92 (1992) (O'Connor, J., concurring) (alteration in original) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 52 n.12 (1983)). In fact, "common-sense . . . is sufficient . . . to uphold a regulation." *United States v. Kokinda*, 497 U.S. 720, 734–35 (1990) (plurality opinion). And the restriction "need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808. Stated differently, a regulation of a nonpublic forum "is valid . . . unless it is unreasonable, or, as was said in *Lehman*, 'arbitrary, capricious, or invidious.'" *Kokinda*, 497 U.S. at

---

[5] The Supreme Court recently noted that there are four types of forums: (1) traditional public forums; (2) designated public forums; (3) limited public forums; and (4) nonpublic forums. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250–51 (2015). I disagree with the Majority's opinion to the extent it suggests otherwise. *See* Majority Op. 11 & n.2.

725–26 (quoting *Lehman v. City of Shaker Heights*, 418 US. 298, 303 (1974)).

Here, as the District Court found, one of the purposes of the advertising space is to "maintain[] the Airport as a family-friendly" or comfortable environment. *See NAACP*, 39 F. Supp. 3d at 628; *see also* App. 802 (Tyrrell stating that the Airport "make[s] a very concentrated and huge effort to keep everything positive, everything non-controversial, and just create an environment that is soothing and pleasing" when asked about the rejection of advertisements).[6]

---

[6] The Majority's rationale for declining to infer that one purpose of the forum was to create a congenial environment is in error. According to the Majority, there is "no reason to doubt the City does try to maintain a 'soothing and pleasing' environment." Majority Op. 23. Instead of stopping here and determining whether this fact supports an inference that the advertising space shares this purpose, the Majority goes on to add to this purpose a desire to ban noncommercial advertising to avoid controversy. And from this, the Majority concludes that since there is no ban on noncommercial advertising throughout the Airport, no inference can be made that the advertising space would have such a purpose. *Id.* at 22–23. In doing so, the Majority confuses the purpose of the forum—to create a soothing or congenial atmosphere—with the means of achieving that goal—banning noncommercial advertising. Because the latter does not illuminate the purpose of the forum, it should not be considered while attempting to discern as much. And while it is true that the parts of the Airport leased to others are not encumbered by the Policy's prohibition of noncommercial advertising, this concern is properly analyzed when

Our initial task then, is to determine whether the Policy's ban on noncommercial advertisements is a reasonable or commonsense way to promote a congenial atmosphere through the use of the City's more than 100 Airport monitors. I believe it is.

As Tyrrell explained, noncommercial advertisements are more likely to be controversial or offensive than commercial offers. *See* App. 808. Noncommercial messages often seek to convey an opinion or advocate a position—goals motived by a desire to confront people on issues about which they disagree, sometimes very emotionally. Commercial advertisements on the other hand, seek only to sell a product and are less likely to advocate a position. Although it is undoubtedly true that *some* commercial advertisements may be more controversial or offensive than *some* noncommercial content, common sense suggests that advocative messages are more likely to create rancor and interfere with the City's desire to promote a congenial atmosphere at the Airport.[7]

To use a simple example, imagine that the monitors are rented by an organization seeking to abolish the death penalty. To advance its cause, the organization depicts videos or photos of executions. If those advertisements were

considering whether the Policy is reasonable in light of all the *surrounding circumstances*, not in determining the purpose of the forum.

[7] To the extent the District Court and the NAACP claim that the City must show that noncommercial advertisements would disrupt the Airport's functioning, I disagree. Because the forum at issue here is the monitors, the City must show only that noncommercial messages interfere with the goal of promoting a comfortable environment.

10

effective, perhaps death penalty advocates or victims' rights groups would buy space showing similarly gruesome footage of the victims of those who were executed. It would seem obvious that these images would be controversial and inappropriate for travelers heading to their gates. While these examples were (before today) hypothetical, this may no longer be the case. And many courts that have considered similar dilemmas have found prohibitions on public transit like the one here reasonable attempts to keep the peace. *See, e.g., Lehman*, 418 U.S. at 304 (plurality opinion) (upholding a ban on noncommercial speech, in part, to avoid subjecting bus passengers and others to controversial messages);[8] *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp. (SMART)*, 698 F.3d 885, 892–94 (6th Cir. 2012) (upholding a ban on political advertisements on buses that "might alienate riders"); *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 975, 979 (9th Cir. 1998) (finding it constitutional to limit exterior advertising on buses to "speech which proposes a commercial transaction" and holding that the city's interests in "maintaining neutrality on political and religious issues" is "especially strong").

But this does not end our inquiry. For a regulation to pass constitutional muster, it must also be reasonable in light of all the circumstances surrounding the forum. Here, those include the many other media and advertisements that fill the Airport, ranging from television screens tuned to news broadcasts to advertisements within retail outlets. Does the existence of media unconstrained by the Policy render it

---

[8] I disagree with the NAACP's characterization of *Lehman*'s "captive audience" analysis. *See Children of the Rosary*, 154 F.3d at 977 (rejecting a similar argument).

unreasonable in its regulation of the advertising space? I think not.

By banning noncommercial advertisements on the monitors there will be less controversy in the Airport than there would be if the Policy were never enacted. While other forums scattered throughout the Airport might display controversial noncommercial messages, it still seems reasonable to think that disallowing controversial advertisements on the Airport's more than 100 monitors will have a positive impact on travelers' experiences by removing some stress or controversy from their journeys. Because the Policy reasonably achieves the goal of promoting a congenial environment in light of the surrounding circumstances, I would find it facially reasonable.

The NAACP counters that the Policy is unreasonable because it simultaneously forbids the noncommercial speech of private parties and permits noncommercial speech by the City. This argument could carry the day but for the government speech doctrine. Although the First Amendment prevents the City from circumscribing private speech however it wishes, those restrictions do not apply when the City itself speaks and the City may control the content it wishes to display on its monitors. *Cf. Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2245 (2015) ("[W]hen [the] government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."). Because the City has the latitude to control its own speech, it is reasonable for the City not to subject itself to the same constraints to which it must subject private speakers.

In all, the Policy need not be the most reasonable or the only reasonable way to achieve the goals the City wishes

to pursue on its monitors. The Policy need only be reasonable—that is, it must not be arbitrary, capricious, or invidious. For the reasons stated, I would hold that the Policy satisfies what the Majority rightly acknowledged is a "light" burden, Majority Op. 26.

2

Apart from being reasonable, a speech restriction in a nonpublic forum must also be viewpoint neutral. *Pittsburgh League of Young Voters Educ. Fund v. Port Auth.*, 653 F.3d 290, 296 (3d Cir. 2011) (citing *Rosenberger*, 515 U.S. at 829). This means that if the government permits speech regarding a particular subject on government property, it must allow for the expression of all viewpoints on that subject. *Cornelius,* 473 U.S. at 806. To do otherwise and deny access to a forum solely to suppress a point of view is "anathema to free expression and impermissible in both public and nonpublic fora." *Pittsburgh League*, 653 F.3d at 296 (citing *R.A.V. v. City of St. Paul*, 505 U.S 377, 382 (1992)).

Here, the NAACP claims the Policy is not viewpoint neutral for two reasons: (1) the City distinguished between commercial and noncommercial advertisements for discriminatory reasons; and (2) it allows the City to post noncommercial advertisements while prohibiting private groups from doing so. For reasons I shall explain, I disagree.

i

According to the NAACP, the City intended to discriminate against views that run contrary to the City's viewpoint when it enacted the Policy and this illicit motive requires the Policy's invalidation. This argument is foreclosed

by the NAACP's facial challenge. Since the Policy excludes private speakers who agree with the City as well as those who disagree, it is facially neutral and our inquiry in that regard is complete. *See Bailey v. Callaghan*, 715 F.3d 956, 959–60 (6th Cir. 2013) (declining to look beyond the text of a facially-neutral statute to examine claims of improper legislative motive because "the law forecloses this kind of adventure"); *Wisc. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 648–53 (7th Cir. 2013) (same). And even assuming, *arguendo*, that the City had such a motive and that an inquiry into the City's motivations is permissible in the context of this facial challenge, the NAACP's argument still fails.

To the NAACP, motive is relevant because "the line between viewpoints and subjects is such an elusive one" and "classifying a particular viewpoint as a subject rather than as a viewpoint *on a subject*" can be a tactic to impermissibly exclude unwanted viewpoints from a particular forum. *See* NAACP Br. 44 (quoting *Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth.*, 100 F.3d 1287, 1298 (7th Cir. 1996)). While this reasoning could support an argument that "noncommercial speech" is actually a viewpoint rather than a subject matter which may be banned, the NAACP neither makes this argument nor would it be supported by caselaw. *See, e.g.*, *Lehman*, 418 U.S. at 303–04 (upholding a regulation that banned political and issue-based advertising); *Pittsburgh League*, 653 F.3d at 297 (noting that rejecting advertisements because of their noncommercial character is viewpoint neutral); *Children of the Rosary*, 154 F.3d at 975, 980–81 (finding a regulation permitting only commercial advertising on buses viewpoint neutral); *Lebron v. Nat'l R.R. Passenger Corp. (Amtrak)*, 69 F.3d 650, 653, 656–59 (2d Cir. 1995) (finding a regulation permitting only commercial

advertising on a large billboard viewpoint neutral). And to the extent the NAACP argues that an illicit motive alone is sufficient to invalidate a policy, I cannot agree because the Supreme Court has stated otherwise. *See United States v. O'Brien*, 391 U.S. 367, 383 (1968) ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."); *see also Children of the Rosary*, 154 F.3d at 980 (stating that motive alone "is not dispositive when there is no indication that the city is implementing the standard in a viewpoint discriminatory manner that reflects an intent to use the policy to exclude disfavored perspectives on the issues"); *cf. Cornelius*, 473 U.S. at 811–13 (questioning the viewpoint neutrality of a regulation in light of allegations of *both* improper motive and viewpoint discriminatory application). "A façade for viewpoint discrimination, in short, requires discrimination behind the façade." *Grossbaum*, 100 F.3d at 1292–94, 1296–98.

ii

The NAACP also argues that the Policy discriminates on the basis of viewpoint because it allows the City to post noncommercial advertisements despite forbidding private advertisers from doing the same. According to the NAACP, the Policy is a façade for viewpoint discrimination because the City may speak on issues such as the value of beer brewing, but the Policy would prohibit a temperance organization from posting a countervailing advertisement. In response, the City seeks refuge in the government speech doctrine. On this close question, I believe the City has the better argument.

15

According to the government speech doctrine, "when [the] government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker*, 135 S. Ct. at 2245. Rather, "[t]he Free Speech Clause restricts government regulation of private speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). And when the government speaks, "the First Amendment strictures that attend the various types of government-established forums do not apply." *Walker*, 135 S. Ct. at 2250. Instead, "the democratic electoral process . . . provides a check on government speech." *Id.* at 2245.

Based on these statements, our inquiry into the viewpoint neutrality of the Policy is straightforward. Limiting the field of the City's speech in this area would appear to be foreclosed by *Summum* and *Walker*, both of which make clear that the strictures of the Free Speech Clause do not apply to government speech. *Walker*, 135 S. Ct. at 2245–46, 2250; *Summum*, 555 U.S. at 467–69. For this reason, I would find the Policy's exception for government noncommercial speech permissible. I say this with some hesitation, however, because both *Summum* and *Walker* focused on whether *all* the speech in a given venue constituted private speech or government speech. Unlike those cases, here the City's speech occurs in a venue shared by the government and private speakers alike. This difference raises a number of unique concerns not directly at issue in *Summum* and *Walker*.

For instance, with the government and private parties sharing the same venue, passersby may have difficulty identifying who is responsible for displaying any particular message. At this point, the check provided by the democratic process largely disappears, as the ability to discern the City's speech is impaired.

16

In addition, with the power to express noncommercial positions and exclude those to the contrary, the City could create an environment in which passersby are led to believe that the City's positions are uncontested. It may appear that the opportunity to contest the government's message exists by posting an opposing advertisement on the wall monitors, but that no one has done so. This illusion of consensus, which uniquely threatens the marketplace of ideas, is similar to the concern Justice Alito warned of in his dissent in *Walker*. *See* 135 S. Ct. at 2255–56 (arguing that the Court's understanding of the government speech doctrine may permit the government to erect electronic billboards, post its own messages on them, simultaneously display only those private advertisements it approves of, and avoid the First Amendment by asserting all of the speech emanates from the government). In response to that concern, the Court has instructed that when the government speaks, "it is not barred by the Free Speech Clause from determining the content of what it says" and "the First Amendment strictures that attend the various types of government-established forums do not apply." *Walker*, 135 S. Ct. at 2245, 2250. Based on that directive, I must conclude that the Policy does not implicate viewpoint discrimination concerns that would plainly exist if private speech were at issue.

\* \* \*

For the reasons stated, I would reverse the District Court's order and enter summary judgment for the City of Philadelphia.